IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JEROME CALVERT,

                **Plaintiff,**

    **v.**

JUANITA HICKS,
INDIVIDUALLY; TINA
ROBINSON, INDIVIDUALLY;
PHYLLIS BROWN,
INDIVIDUALLY; AND FULTON
COUNTY, GEORGIA,

              **Defendants.**

1:04-cv–1257-WSD

## OPINION AND ORDER

This matter is before the Court on Defendants Fulton County, Juanita Hicks,

Tina Robinson, and Phyllis Brown's Motion for Summary Judgment [69],

Plaintiff's Statement of Facts [74], Plaintiff's Memorandum of Law in Response to

Defendants' Motion for Summary Judgment [76], and Defendants' Reply to

Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment

[84].[1]

---

[1] Also before the Court are Defendants' Motion to Exceed Page Limitation
[68] and Plaintiff's Motion to Permit Him to Extend the Page Limit for His
response to Defendants' Motion for Summary Judgment [75].  Having considered
the submissions, and because the motions are unopposed, the Court GRANTS the

I.      **BACKGROUND**

This dispute arises from the transfer, reprimand, suspension, and eventual termination of Plaintiff Jerome Calvert's ("Plaintiff")  employment with the Clerk's Office of the Superior Court of Fulton County. ("Clerk's office").  Plaintiff was hired as a deputy clerk in the Clerk's Office in 1998.  (Defendants' Statement of Material Facts to Which There Is [sic.] No Genuine Issues to Be Tried ¶ 1.) ("Defs. Statement of Facts").  Plaintiff was given jobs with increasing responsibility from the time of his hire until early 2002.  Plaintiff started in the deed room, was later transferred to the filing room and then was assigned to the civil filing room.  In early 2002, Plaintiff was selected to provide direct support to a specific judge's chambers as part of what was called the "Haggerty Plan." Plaintiff provided this direct chambers support until late summer or early fall of 2002.  During this four year period, Plaintiff received two counseling memos for mishandling documents and absenteeism, and two warning memos for insubordination, none of which resulted in any significant disciplinary action.

---

motions for leave to file excess pages.

The Court notes that Defendants have failed to certify that their briefs meet the page and type limitations of Local Rule 5.1B.  Such certification is required by Local Rule 7.D.

In early 2002, deputy clerk Lewis Pittman ("Pittman") announced his candidacy for Clerk of the Superior Court.  Plaintiff supported Pittman's candidacy, and exhibited his support publicly by marching with Pittman in a parade in June of 2002.

Superior Court Clerk Juanita Hicks ("Hicks" or the "Clerk") "considered her deputy clerks who supported Pittman to be disloyal to her."  (Defs. Statement of Facts ¶ 9.)  Plaintiff alleges that Hicks, chief deputy Tina Robinson ("Robinson"), and high-level supervisor Phyllis Brown ("Brown"), each of whom is black, were angered that Plaintiff, who also is black, would support Pittman.  Pittman is a white male.  Hicks, who purports to have been worried about "sabotage" by Pittman supporters, transferred Plaintiff and other deputy clerks who supported Pittman to assignments "where their work could be more closely supervised."  (Id. at 11.)  The parties do not dispute that Hicks alone decided to enact these transfers.  Plaintiff specifically was transferred from his assignment in the Haggerty Plan to inmate mail processing under the management of Defendant Brown.  This transfer involved a change in physical location and job responsibility for Plaintiff, although his formal title of "Calender Clerk" and his B-23 pay "rank" did not change.

-3-

In the year following the transfer, Plaintiff received approximately twenty (20) counseling and disciplinary memoranda and disciplinary letters from Brown and her subordinates for alleged problems including tardiness, absenteeism, insubordination, and document mishandling. Plaintiff, on Brown's recommendation and with Robinson's involvement, was twice suspended. Plaintiff was transferred again in late 2003. There is no record of any disciplinary action against Plaintiff after his transfer from Brown's supervision. Despite this absence of disciplinary action, on March 8, 2004, Hicks and Robinson decided to terminate Plaintiff and he was sent a letter of termination dated March 11, 2004.

The parties disagree regarding the circumstances of the disciplinary acts (upon which the later termination were based) taken against Plaintiff after his transfer to inmate mail. Defendants contend that Plaintiff was an inferior employee, and his discharge was the natural result of repeated disciplinary infractions. Plaintiff contends that because he was a protected civil service employee (technically, a "permanent, classified employee," see Defs. Statement of Material Facts ¶ 45) who could only be dismissed for cause, Defendants sought to "paper" his employee file with pretextual disciplinary infractions with the ultimate goal of terminating him. Plaintiff claims the transfer, reprimands, suspensions, and

termination were a course of deliberate conduct taken by Brown, Robinson, and Hicks in retaliation for his political support of Pittman.

The parties agree that at least six other clerk's office employees were known or rumored to have supported Pittman: Deputy clerks Eric Styles, Dawn Nathanson, Peggy Andersen, and Cindy Laurie, and temporary employees Michael Armstrong and Lasandra Styles. Michael Armstrong, Eric Styles, and Lasandra Styles are black. Dawn Nathanson, Peggy Anderson, and Cindy Laurie are white. Eric Styles and Dawn Nathanson were transferred in response to their support of Pittman. (Defs. Brief in Support of Mot. for Summ. Judg. at 4) ("Defs. MSJ Brief"). Michael Armstrong and Lasandra Styles were terminated. No action appears to have been taken against Peggy Andersen or Cindy Laurie.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d

1241, 1246 (11th Cir. 1999).  There is no dispute of material fact if "a party . . .

fails to make a showing sufficient to establish the existence of an element essential

to that party's case, and on which that party will bear the burden of proof at trial."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party has

met this burden, the non-movant must demonstrate that summary judgment is

inappropriate by designating specific facts showing a genuine issue for trial.

Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  The

non-moving party "need not present evidence in a form necessary for admission at

trial; however, he may not merely rest on his pleadings."  Id.

   The Court must view all evidence in the light most favorable to the party

opposing the motion and must resolve all reasonable doubts in the non-movant's

favor.  United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am., 894 F.2d 1555,

1558 (11th Cir. 1990).  "[C]redibility determinations, the weighing of evidence,

and the drawing of inferences from the facts are the function of the jury . . . ."

Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must

not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d

at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party," summary judgment for the moving party is

proper.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986).

## III.   DISCUSSION

Plaintiff has two claims remaining in this case: a political patronage First

Amendment retaliation claim under 42 U.S.C. § 1983, and a traditional race

discrimination claim under § 1983.  Defendants argue both of Plaintiff's claims fail

as a matter of law.  The Court disagrees.

### A.   Plaintiff's Political Patronage Claim

#### 1.   *Plaintiff's Transfer, Reprimand, Suspension, and Dismissal*

The First Amendment to the Constitution "protects political association as

well as political expression."  Buckley v. Valeo, 424 U.S. 1, 13 (1976).  Significant

impairments to First Amendment rights "must survive exacting scrutiny."  Elrod v.

Burns, 427 U.S. 347, 362 (1976) (Brennan, J., plurality opinion).  For a state to

infringe upon an individual's political association rights, the state interest used to

justify the violation "must be paramount . . . of vital importance, and the burden is

on the government to show the existence of such an interest."  Id. at 362.  This

paramount interest "must outweigh the incurred loss of protected rights" and be the

least restrictive means.  Id.

The practice of political patronage allows "public employees [to] hold their jobs on the condition that they provide, in some acceptable manner, support for the favored political party [or candidate]." Elrod, 427 U.S. at 359. "The cost of the practice of patronage is the restraint it places on freedoms of belief and association." Id. at 355.

The need for political loyalty in some governmental positions is an adequately paramount state interest, but only if "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Branti v. Finkel, 445 U.S. 507, 518 (1980). Party affiliation can be an appropriate requirement when the position is confidential or involves the making of policy which "relate[s] to the needs of . . . partisan political interests." Id. at 519 (finding that the primary duties of appointed counsel are "not to the public at large, except in the general way," and thus public defenders are not subject to patronage dismissal). See also Elrod, 427 U.S. at 365.

"[I]t is important to retain the distinction between actions that assert employees' right of expression and actions that challenge discharge decisions based on political patronage." Terry v. Cook, 866 F.2d 373, 377 (11th Cir. 1989). When public employment "is absolutely conditioned on political allegiance and not

upon the content of expressions of political beliefs," the political patronage

analysis is appropriate.  Id.

Under Eleventh Circuit law, "for a public employee to establish that an

employer conditioned his . . . job in a way that burdened impermissibly a

constitutional right, the employee must first demonstrate that the asserted right is

protected by the Constitution and that he . . . suffered 'adverse employment action'

for exercising the right."  McCabe v. Sharrett, 12 F.3d 1558, 1562 (11th Cir. 1994).

Where the employer denies taking the adverse employment action solely because

the employee exercised the expressive association right of political affiliation, the

Plaintiff has a burden to show that the constitutionally protected conduct was a

"substantial" or "motivating factor" in the decision to take the adverse action.  Mt.

Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); see

also McCabe, 12 F.3d at 1565.

What constitutes an "adverse" employment action "is broadly defined, and

as a matter of law includes not only discharges, but also demotions, refusals to

hire, refusals to promote, and reprimands."  Id. at 1563.  See also Rutan v.

Republican Party of Illinois, 497 U.S. 62, 75 (1990) (holding that actions such as

refusals to promote, transfer, or recall based on political affiliation are

impermissible infringements on public employees' First Amendment rights).  In the First Amendment context, adverse actions "must involve an important condition of employment," such as "discharges, demotions, refusals to hire or promote, and reprimands . . . . [and] any other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunity, or adversely affects his or her status as an employee." Akins v. Fulton County, Ga.. 420 F.3d 1293, 1300 (11th Cir. 2005) (citations and quotations omitted).  For example, "[e]mployees who find themselves in dead-end positions due to their political backgrounds are adversely affected.  They will feel a significant obligation to support political positions held by their superiors, and to refrain from acting on the political views they actually hold, in order to progress up the career ladder."  Rutan, 497 U.S. at 73.  A transfer "can constitute an adverse employment action . . . even if under state law the transfer is not considered a demotion."  Hinson v. Clinch County, Ga. Bd. of Educ., 231 F.3d 821, 829 (11th Cir. 2000).  Transfers are adverse if a reasonable person would view the transfer to involve "a reduction in pay, prestige, or responsibility."  Id.

The parties do not dispute that Plaintiff's public support of Pittman's candidacy is political association protected by the First Amendment.  The parties

also do not dispute that Plaintiff was transferred, received numerous disciplinary reprimands, was twice suspended, and eventually terminated, after his support for Pittman became known.  Under Hinson, McCabe and Rutan, reprimands and transfers, as well as overt disciplinary actions such as suspension or termination, can constitute "adverse employment actions" for First Amendment purposes.

Defendants argue first that Plaintiff's transfer to inmate mail was not an adverse employment action.[2]  Plaintiff raises a genuine issue of fact concerning whether his transfer constituted an adverse employment action.  Plaintiff offers his sworn testimony that the move to inmate mail, although technically lateral, was a move to a "dead end" position of diminished responsibility, which had a reduced possibility for promotion.  Testimony in the record corroborates that Plaintiff's responsibilities in inmate mail were substantially more menial and his position less prestigious than the Haggerty Plan position he held.  Hinson, 231 F.3d at 829.  Plaintiff identifies testimony that the position to which he was transferred was the kind of "dead-end" position designed to compel him to "feel a significant obligation to support political positions held by their superiors, and to refrain from

_____

[2] Defendants do not dispute that the reprimands and suspensions given to Plaintiff while he worked in inmate mail, and his eventual termination, constitute adverse employment actions.

acting on the political views [he] actually hold[s], in order to progress up the career ladder." <u>Rutan</u>, 497 U.S. at 73.  Plaintiff has raised an issue of fact concerning whether the transfer affected important conditions of his employment, and whether it should be viewed as an effective demotion, and one which adversely affected his status as an employee.

Defendants next argue that Plaintiff has failed to offer evidence that the transfer, reprimands, suspension, or termination were motivated by patronage retaliation.[3]  Plaintiff also has raised a genuine issue of fact on this issue.  The parties do not dispute that Plaintiff was transferred from his work with the Haggerty Plan to work in inmate mail as a result of his support of Pittman.

Plaintiff offers deposition testimony from his immediate supervisors in inmate mail, Bill McFarland and Larry Tillman, to show that Brown singled Plaintiff out, placed unusual demands on his work and his attendance, not imposed

---

[3]  Defendants also argue the "same decision" defense, namely that they would have taken the same adverse actions even if Plaintiff had not supported Pittman.  This is an affirmative defense for which Defendants carry the burden of proof.  By raising a genuine issue of fact that patronage was a motivating factor behind the entire course of conduct engaged in by Defendants, including the transfer, reprimands, suspensions, and termination, Plaintiff also raises sufficient issues of fact regarding whether Defendants would have made the same decision in the absence of Plaintiff's support for Pittman.

upon any other employees, and made extraordinary efforts to note disciplinary infractions in his employment record.  Plaintiff has identified testimony that his attendance and work behavior were similar to other employees working under Brown, but that he was disciplined for his behavior while other employees were not.  Plaintiff also has identified testimony from McFarland and Tillman that suggests that other employees under Brown's supervision were not subject to such treatment.

Plaintiff has offered testimony to show that Brown and Robinson knew of Plaintiff's support for Pittman and of Hicks's alleged desire to treat Pittman supporters differently than other Clerk's office employees, and that Brown and Robinson were present at a meeting at which Hicks purportedly discussed her distrust of Pittman supporters.  Plaintiff notes Brown's deposition testimony, in which she stated a personal belief that a Pittman supporter could not commit a good-faith error.  Brown stated that any mistake by a Pittman supporter necessarily had to be sabotage.  Brown's statement is nearly identical to a similar statement made by Hicks.  Plaintiff cites that Brown testified that Plaintiff's support of Pittman "may have" been discussed between her and Hicks.  Plaintiff also notes testimony that Hicks believed that Brown knew that Plaintiff supported Pittman.

The record further shows that other known or suspected Pittman supporters suffered adverse employment actions.  Some, like Michael Armstrong and Lasandra Styles, were terminated.  Others, like Dawn Nathanson, were transferred to positions of purportedly inferior stature, similar to the inmate mail position to which Plaintiff was transferred.

Making all inferences in the Plaintiff's favor, Plaintiff raises genuine issues of fact regarding whether: (i) Hicks intended to treat Pittman supporters adversely; (ii) Brown was aware that Hicks wished to terminate Plaintiff for patronage reasons, and reprimanded Plaintiff and recommended his suspension to accomplish this objective; and (iii) Robinson and Hicks participated in patronage retaliation by directing, taking advantage of, or being complicit in Brown's efforts to "paper" Plaintiff's record to suspend him, and ultimately to terminate his employment.

2.    *The Role of Fulton County Deputy Clerks*

Defendants next argue that, as a matter of law, the position of deputy clerk is one for which patronage action is appropriate.  Defendants note, "[p]ursuant to O.C.G.A. § 15-6-59 . . . deputy clerks are required to take the same oath as the clerk.  The powers and duties of the deputy clerks are the same as those of the clerk."  (Defs. MSJ Brief. at 18.)  Defendants claim that deputy clerks are "the alter

ego of the clerk," and thus are policymaking positions for which patronage action is appropriate.[4]  (Id.)

In Terry v. Cook, the Eleventh Circuit addressed the issue of what positions may permissibly be subject to political patronage action.  In Terry, the court held that, under Alabama law, an Alabama sheriff had "complete and absolute control" over hiring and firing his deputies "regardless of any first amendment limitations." 866 F.2d at 377.  The court reasoned that "a deputy sheriff is the general agent of and empowered to enter into business transactions for the sheriff. . . and the sheriff is civilly liable for all actions committed by a deputy done in the performance of his duty."  Id.  Because the sheriff was "totally responsible" for the acts of his deputies, the court held that the sheriff could refuse to hire based on political loyalty.  Id.  In contrast, the court held that the positions of clerk, investigator, dispatcher, jailer, and process server in the sheriff's office were not subject to patronage, because:

---

[4] This claim is suspect at least because Hicks has not claimed or shown that political loyalty was important to her at any prior time in her long tenure as Clerk Hicks has not claimed that Plaintiff's (or any other employees political) loyalty is a requirement to be hired in the Clerk's Office.  Rather, the actions underlying this suit are admitted to have been taken only because Plaintiff supported her opponent.

> Such positions traditionally revolve around limited objectives and defined duties and do not require those holding them to function as the alter ego of the sheriff or ensure that the policies and goals of the officer are implemented.  Although it can be said that each job in the sheriff's office implements the policies of the office, the limited and defined roles these [non-deputy] positions tend to play do not support the need for political loyalty to the sheriff.

Id. at 378.

In Stough v. Gallagher, 967 F.2d 1523 (11th Cir. 1992), decided a few years after Terry, the Eleventh Circuit clarified that a Florida sheriff's absolute control over his deputies was appropriate because of the "unique historical status" of the deputy sheriff under Florida law, because Florida deputy sheriffs are appointed and "clothed with power," are not employees, and have "no property or liberty interests in their positions for the purposes of the Fourteenth Amendment."  Stough, 967 F.2d at 1530.

Defendants put particular emphasis on a case from the Western District of Arkansas, Wagner v. Hawkins, 634 F.Supp 752 (W.D.Ark. 1986).  In that case, decided prior to Terry, an Arkansas district court held that a secretary, county road crew foreman, county coordinator for emergency services, and veterans service officer were subject to patronage dismissal by the county judge.  Id. at 753-54.

-16-

The court reasoned, "[i]t is . . . plain that these positions were ones of trust and confidence, the work of which was often unsupervised, so that the risk of acts of deliberate disloyalty by those occupying them was not one that the County Judge was required to run." Id. at 754.

Defendants argue that O.C.G.A. § 15-6-59 establishes that deputy clerks are "alter egos" of the Clerk in the same manner that deputy sheriffs in Alabama or Florida were held in Terry and Stough to be alter egos of the sheriff, or that supervisory county employees were held to be trusted lieutenants of the county judge in Wagner.  That statute reads:

> The clerks of the superior courts shall have the power to appoint a deputy or deputies and may require from him or them a bond with good security. The deputies shall take the same oaths as the clerks do before entering upon the discharge of their duties. Their powers and duties shall be the same as those of the clerks, as long as their principals continue in office and not longer, for faithful performance of which they and their securities shall be bound. The clerks of the superior courts shall also have the authority to appoint one of their deputies as chief deputy clerk unless otherwise provided by local law.

O.C.G.A. § 15-6-59(b).

In cases noted by Defendants,[5] including <u>Terry</u>, <u>Stough</u>, and <u>Wagner</u>, the propriety of patronage was determined by the powers of the elected official, which were in turn determined by state law.  Under Georgia law, deputy clerks "are not county employees, but the employees of the clerk of the superior court." <u>Taylor v. Bartow County, Ga.</u>, 860 F.Supp. 1526, 1536.  (N.D.Ga. 1994).  Although O.C.G.A. § 15-6-59 nominally grants deputy clerks the same "powers and duties" as the Clerk, the record shows that the roles of Clerk and deputy clerk are not the same.  Fulton County Deputy Clerks are civil service employees and are protected by a civil service code authorized by O.C.G.A. § 36-1-21.  The Fulton County civil service code prohibits the dismissal of permanent, classified employees, such as Plaintiff, except for cause.

O.C.G.A. §§ 15-6-61 and 15-6-62 set forth an extensive list of duties of the clerk of superior court.  These duties are in essence broad policy guidelines such as

---

[5] Other cases relied on by Defendants include <u>Aspinwall v. Herrin</u>, 879 F.Supp. 1227 (S.D. Ga. 1994), <u>Cutcliffe v. Cochran</u>, 117 F.3d 1353 (11th Cir. 1997), and <u>Silva v. Bieluch</u>, 351 F.3d 1045 (11th Cir. 2003). These cases do not support Defendants' position.  In <u>Cutcliffe</u>, for example, a Southern District of Georgia Court stated that Georgia sheriffs are limited in their powers by civil merit systems.  <u>Id.</u> at 1234.  The only issue in that case was whether those limitations were clearly established law in 1993.  <u>Cutliffe</u> and <u>Silva</u> involved Florida sheriffs whose powers were defined by Florida law.

"attend to the needs of the court in the performance of the duties of the clerk."

Id. § 15-6-61(a)(2).  Deputy clerks, in contrast to the Clerk's broad policy duties,

have a more limited role.  Their role is to aid the Clerk's policy-making duties by

carrying out limited and well-defined tasks.

The Supreme Court and Eleventh Circuit have, in patronage cases, focused

on the function of the employee.  The limited nature of a deputy clerk's job

responsibilities are manifest in the record.  Plaintiff, for example, was moved from

the position of deed room clerk to civil docketing clerk to a Haggerty Plan clerk to

inmate mail, and had differing discrete and well-defined responsibilities in each

role.  These responsibilities centered around relatively menial tasks, such as

docketing deeds or litigation documents, or processing inmate mail.  The record

does not show that Plaintiff or any other deputy clerk in a non-supervisory position

had policymaking authority or significant discretion in the performance of their

duty.  The record shows rather that Plaintiff was closely supervised not only in

inmate mail, but in all of his tasks as a deputy clerk.  Defendants note that Plaintiff

was disciplined for "booking and paging" inmate mail incorrectly.  In noting this,

Defendants acknowledge that Plaintiff was assigned to perform menial, closely

supervised, tasks, and that he had little discretion over the manner of his performance.

The record supports Plaintiff's contention that deputy clerks are not policymakers or confidential employees.  Their function is largely ministerial, and involves mostly the "limited and defined" tasks of processing documents.  The record shows that deputy clerks have little discretion in the manner of their job performance.  Their role appears from the record to follow the specific instructions of their supervisors to accomplish discrete, limited, and well-defined goals.  The lack of significant discretion or confidential stature in the deputy clerk positions is demonstrated not only by the general practice of the office as shown in the record, but also by Hicks's admitted ability to transfer deputy clerks to positions where they could be closely supervised in the performance of the most menial details.  Unlike the county employees in <u>Wagner</u>, deputy clerks are not positions of particular trust and confidence, and are closely supervised.  If Hicks believed that a risk of acts of deliberate disloyalty existed, she demonstrated that those risks could be mitigated because a deputy clerk's role was limited, lacked discretion, and was well-supervised .

The parties do not dispute that Fulton County has enacted a civil service system by which Fulton County deputy clerks, including Plaintiff, are protected. According to that system, deputy clerks can only be dismissed for cause. (Pls. Resp., Exh. 44.)  A Fulton County Clerk thus does not have the same power over her deputies as has been granted to sheriffs by Alabama or Florida law.  See Wayne County v. Herrin, 437 S.E.2d 793, 799 (Ga. App. 1993); see also Aspinwall v. Herrin, 879 F. Supp. 1227 (S.D. Ga. 1994).  Contrary to the unlimited authority described in the cases relied upon by Defendants, the authority of the Clerk of Fulton County was substantially constrained by the institution of a civil service system.  See Herrin, 437 S.E.2d at 797-00; id. at 800 n.5.

Further, Defendants do not contend that deputy clerks, like Plaintiff, in non-supervisory roles in fact act as "general agents" of the Clerk, that they are authorized to enter into business transactions on behalf of the Clerk, or that the Clerk is civilly or otherwise liable in place of the county for their actions.[6] Defendants' analogy to Terry and Stough thus is not persuasive.

---

[6] The Court notes that Defendants have not moved to dismiss Fulton County, Brown, or Robinson on the theory that Hicks alone is responsible for the acts of her deputies.

Defendants' references to cases involving the laws of other states do not affect the facts here, and Defendants have simply failed to show that political affiliation was an "appropriate requirement for the effective performance" of the duties of a deputy clerk.[7]

B.    Plaintiff's Race Discrimination Claim

Defendants next assert that Plaintiff's race discrimination claim fails as a matter of law.  Plaintiff alleges that Defendants discriminated against him racially by transferring, reprimanding, suspending, and terminating him for his support for Pittman, while not taking similar adverse action against white employees who supported Pittman.

Defendants argue, and Plaintiff does not dispute, that Plaintiff has not presented any direct evidence of race discrimination. To show a prima-facie case of race discrimination using circumstantial evidence, Plaintiff must show (1) that he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) similarly situated employees outside his protected class were treated more favorably by his employer; and (4) he was qualified for the job in question.

_____

[7]  The Court notes that there is no evidence that political affiliation was ever a relevant factor to hiring or firing decisions in the Clerk's office prior to the present incident of deputy clerks openly supporting the Clerk's political opponent.

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see also  Holifield v.

Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  Whether other employees are

"similarly situated" is determined by whether "the employees are involved in or

accused of the same or similar conduct and are disciplined in different ways."

Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1323 (11th Cir. 2006).

Once Plaintiff establishes a prima facie case, Defendants are presumed to

have discriminated unlawfully and the burden shifts to Defendants to offer a

legitimate, non-discriminatory reason for the adverse actions taken.  McDonnell,

411 U.S. at 802.  Defendant's burden of production is satisfied if "the defendant's

evidence raises a genuine issue of fact as to whether it discriminated against

plaintiff."  Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 254 (1981).

Plaintiff then carries the burden to discredit Defendants' proffered reason by

showing that it is pretextual.  Id. at 256; Standard v. A.B.E.L. Servs., Inc., 161 F.3d

1318, 1331 (11th Cir. 1998).  At the summary judgment phase, Plaintiff only is

required to "create a genuine issue of material fact as to whether the reasons

advanced are pretextual."  Standard, 161 F.3d at 1332.  Plaintiff can accomplish

this "(1) by showing that the legitimate nondiscriminatory reasons should not be

believed; or (2) by showing that, in light of all the evidence, discriminatory reasons

more likely motivated the decision than the proffered reasons." Id.  "To survive summary judgment, the plaintiff must . . . present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice."  Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).  To establish pretext, "the district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir.1997)).

Plaintiff has stated a prima facie case of discrimination.  The parties do not dispute that Plaintiff is black, that he was qualified for the position of deputy clerk, or that he was transferred, reprimanded, suspended, and terminated.[8]

Defendants argue that Plaintiff has not shown that similarly situated white employees were treated differently.  To state a prima facie case, Plaintiff needs

---

[8]  Defendants dispute that the transfer is an "adverse" employment action, but do not dispute its occurrence.

only to show that similarly situated white employees were treated "more favorably" than he was.  See Holifield, 115 F.3d at 1562.  Plaintiff has done this. The record supports Plaintiff's contention that white Pittman supporters were not subjected to the course of transfer, increased disciplinary action, and termination that Plaintiff claims to have suffered.  Even though Nathanson was transferred, Defendants do not contend that her subsequent treatment was similar to Plaintiff's.[9]

Defendants offer a legitimate, non-discriminatory reason for the actions taken against Plaintiff.  Defendants claim that Hicks transferred Plaintiff to inmate mail "so that his work product could be more closely supervised to prevent any threat of potential sabotage."  (Defs.' MSJ Brief. at 35.)  Defendants admit that Nathanson was transferred to the jail for the same reason.  Defendants then claim

---

[9]  Defendants argue that Nathanson was not "similarly situated" to Plaintiff because she did not have a disciplinary history similar to Plaintiff's.  This argument is specious.  Plaintiff contends that the twenty (20) of the twenty-four (24) disciplinary actions that comprise his total disciplinary history themselves constitute discriminatory actions taken against him.  Defendants in essence argue that Plaintiff must first show that Nathanson was treated as unfavorably as himself by receiving increased disciplinary action, suspension, or termination, after being transferred, before he is permitted to argue that she was treated more favorably. This argument does not have any basis in the law.  The record shows that Nathanson was similarly situated to Plaintiff in all relevant respects: both were deputy clerks in  non-supervisory positions, neither is alleged to have significant disciplinary history prior to their support for Pittman, and both were known by Hicks to support Pittman.

that the reprimands, suspensions, and termination following the transfer were "due to repeated issues of absenteeism, tardiness, and insubordination."  (Id.) Defendants conclude that "[t]hese [were] good business decisions."  (Id.)

Plaintiff identifies specific facts in the record regarding the circumstances of his transfer, reprimands, suspensions, and termination, that discredit Defendants' proffered non-discriminatory reason.  Plaintiff received only four reprimands during four years of employment as a deputy clerk prior to his support for Pittman becoming known.  When his support for Pittman became known, he was transferred and received twenty disciplinary actions in a little over a year.  After Plaintiff's record was well-papered with disciplinary actions, he was transferred again.  Plaintiff's new supervisor, however, took no disciplinary actions against Plaintiff in several months, and testified that he was a good employee with a good reputation.  A few months later, Plaintiff was terminated.

The record also supports Plaintiff's suggested inference that the reprimands given to Plaintiff were generated artificially.  For example, Plaintiff's supervisors McFarland and Tillman testified that although it was within their discretion to give or withhold disciplinary writeups, Brown ordered them to administer writeups to Plaintiff on several occasions.  Tillman testified that Brown threatened to write him

up if he failed to give Plaintiff a writeup.  McFarland and Tillman did not receive

similar orders from Brown to write up other employees under their supervision.

Plaintiff and McFarland testified that Brown required Plaintiff to call her directly if

he wanted time off, when the normal procedure would have been for Plaintiff to

call McFarland.  The record suggests that this requirement was not imposed on any

other employee.

The record suggests that Brown sought opportunities to write Plaintiff up.

Plaintiff alleges that Brown made him a scapegoat for at least one mistake for

which Plaintiff was not substantially responsible.  Brown, Robinson, and Hicks

testified that a document error that resulted in a prisoner remaining in jail for two

years past his sentence played a central role in Plaintiff's eventual termination.

The record suggests, however, that the prisoner in question had been wrongly

incarcerated for over a year before Plaintiff was transferred to inmate mail.

McFarland testified that blaming Plaintiff for any part of this situation was

unjustified, and a Clerk's office investigation into the matter reached the same

conclusion.  Testimony in the record indicates that Brown and Hicks were shown

"the documentation exonerating [Plaintiff]."  (Pls. Statement of Material Facts

¶ 153.)[10]  Plaintiff has further demonstrated inconsistencies in the record regarding Brown's awareness of Plaintiff's support of Pittman.  Defendants claim that Brown did not know of Plaintiff's support for Pittman.  Brown, however, testified that Plaintiff's support of Pittman "may have" been discussed between her and Hicks. Plaintiff also points out testimony that Hicks believed Brown knew that Plaintiff supported Pittman, and that Brown and Robinson may have been present at a meeting in which Hicks discussed her desire to treat Pittman supporters differently than other employees.

Plaintiff has identified specific facts in the record to show that the conduct by Brown, Robinson, and Hicks is inconsistent with their proffered nondiscriminatory reason for the adverse actions taken against Plaintiff.  Hicks's well-documented belief that Pittman supporters would sabotage her, her dismissal of two other black suspected Pittman supporters,  Brown's unusual zeal to find fault with Plaintiff, the discrepancies in the accounts of why Plaintiff was terminated, the evidence that Plaintiff's disciplinary record may have been

---

[10]  Brown's own report on the error does not assign any blame to Plaintiff. Brown's testimony is internally inconsistent on this matter.  She appears both to affirm and deny that this situation was a cause of Plaintiff's termination. Hicks and Robinson, however, testified that Plaintiff was terminated over this matter.

artificially enhanced to justify his later termination, and the lack of disciplinary action on Plaintiff's record excepting the period directly after his support for Pittman became known, raise genuine issues of fact concerning whether Defendants' proffered reason was pretextual.

      C.     <u>Liability of Fulton County</u>

A local government body is liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." <u>Monell v. Dept. of Social Servs. of City of New York</u>, 436 U.S. 658, 694 (1978). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality. . . . A custom is a practice that is so settled and permanent that it takes on the force of law." <u>Cooper v. Dillon</u>, 403 F.3d 1208, 1221 (11th Cir. 2005) (quotation and citations omitted). "[Section] 1983 liability may be imposed on a municipality based on governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels." <u>Griffin v. City of Opa-Locka</u>, 261 F.3d 1295, 1308 (11th Cir. 2001) (citations and quotations omitted). To prove the existence of such

a custom, "a plaintiff must establish a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law."  Id.

The "threshold identification of a custom or policy ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  McDowell v. Brown, 392 F.3d 1283, 1290 (11th Cir. 2004) (quotations omitted).  "State and local positive law determine whether a particular official has final policymaker authority for § 1983 purposes." Cooper, 403 F.3d at 1221 (quotations omitted).  "[M]unicipal liability under § 1983 attaches where–and only where–a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986); see also Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994) ("Only those municipal officers who have final policymaking authority may by their actions subject the government to § 1983 liability.").

Plaintiff does not allege that Fulton County has an official or unofficial "custom" of political patronage or race discrimination.  Defendants contend, in the absence of a custom or official policy, that neither Hicks, Robinson, nor Brown were "final policymakers" such that their decisions regarding Plaintiff could be attributed to Fulton County.  A government employee "is a final policy maker only if his decisions have legal effect without further action by the governing body." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1291-92 (11th Cir. 2004). The relevant inquiry is "whether there is an actual opportunity for meaningful review." Id. at 1292.

Plaintiff argues that Hicks, Robinson, and Brown were final policy makers because their decisions to transfer, reprimand, suspend, and terminate Plaintiff were not subject to meaningful review.  Defendants note that "the various acts of which Plaintiff complains were subject to meaningful review by the Fulton County Grievance Review Committee and the Fulton County Personnel Board," and that Plaintiff availed himself of the grievance system once, and appealed the two suspensions and termination to the personnel board, but abandoned his appeals. (Defs. MSJ Brief at 39.)  Plaintiff does not contest that these review mechanisms exist.  Plaintiff does not argue that the Fulton County Grievance Review

Committee or the Fulton County Personnel Board were incapable of reversing the

decisions made by Defendants.  Plaintiff merely makes the conclusory claim that

the review mechanisms were ineffective, and did not provide "meaningful review."

Plaintiff does not offer any evidence to support his claim other than his own

subjective feelings concerning the review process.  Plaintiff thus fails to raise a

genuine issue of fact regarding whether Defendants' decisions were subject to

meaningful review.  Defendants' motion for summary judgment on this ground is

granted.

     D.    <u>Qualified Immunity</u>

"Qualified immunity offers complete protection for government officials

sued in their individual capacities if their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would

have known."  <u>Wood v. Kesler</u>, 323 F.3d 872, 877 (11th Cir. 2003) (citations and

quotations omitted).  The process for analyzing a defense of qualified immunity is

well established:

> To be eligible for qualified immunity, the official must first establish
> that he was performing a "discretionary function" at the time the
> alleged violation of federal law occurred.  Once the official has
> established that he was engaged in a discretionary function, the
> plaintiff bears the burden of demonstrating that the official is not

entitled to qualified immunity.  In order to demonstrate that the official is not entitled to qualified immunity, the plaintiff must show two things:  (1) that the defendant has committed a constitutional violation and (2) that the constitutional right the defendant violated was "clearly established" at the time he did it.

Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004).

"A right is clearly established if, in light of preexisting law, the unlawfulness of the official's conduct is apparent." Cooper v. Dillon, 403 F.3d 1208, 1220 (11th Cir. 2005).  This standard does not require that the specific conduct in question was previously found to be unlawful; the state of the law need only give an official "fair warning" that his conduct is unlawful.  Id. (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)).  See also  Holloman ex. rel. Holloman v. Harland, 370 F.3d 1252, 1278 (11th Cir. 2004)

Qualified immunity therefore "ensure[s] that before they are subjected to suit, officers are on notice their conduct is unlawful."  Id.  There "need not be a case on all fours with materially identical facts before we will allow suits against [government officials]."  Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004).  A constitutional right "can be clearly established even if there are notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that

the conduct at issue violated constitutional rights." Id.  The Court may "assess whether the facts of the instant case fall within statements of general principle from our precedents." Id. at 1278.

It is undisputed that Hicks, Robinson, and Brown each engaged in discretionary acts when they transferred, disciplined, suspended, and terminated Plaintiff.  Plaintiff has presented sufficient evidence to show that these discretionary actions violated his First and Fourteenth Amendment rights to be free from adverse employment actions based on political patronage or racial discrimination.

Defendants argue that a reasonable official could not have understood the course of conduct Plaintiff alleges to be unlawful in light of pre-existing law. Regarding political patronage, the state of the law gave "fair warning" that Fulton County deputy clerks could not be subjected to adverse patronage actions.  Elrod, Branti, and Rutan state clearly that government employees for whom political allegiance is not critical to the performance of their duties have a First Amendment right to be free from adverse employment actions based on patronage.

Defendants argue first that they could not reasonably have known that deputy clerks were in the class of employees not subject to patronage action in

light of <u>Terry</u> and similar cases.  <u>Terry</u>, however, is factually distinct from the circumstances here–different elected positions with significantly different powers over employees arising under state law–and no reasonable Fulton County clerk would have relied on <u>Terry</u> for the proposition that a Fulton County clerk could take adverse actions against her deputy clerks based on a claimed right to exercise a patronage privilege.  <u>Terry</u> and similar cases discuss the propriety of sheriffs in other states exercising patronage powers over their deputies.  In each case, state law granted the sheriff  unrestricted authority over his deputies.  Under Georgia and Fulton County law, a Fulton County Clerk has substantially limited authority to take employment actions against her deputies, different in scope and kind than the authority given to sheriffs in other states.  Specifically, deputy clerks in Fulton County are members of a civil service system that protects them from dismissal without cause.  The Clerk of Fulton County does not have the same unlimited power to hire, fire, and punish as the sheriff in <u>Terry</u>, and no reasonable Clerk would analogize her power to that described by <u>Terry</u>.  A Fulton County Clerk thus

could not rely reasonably on <u>Terry</u> and like cases to conclude that the exercise of a claimed patronage power against her deputies was permissible.[11]

Defendants next argue that no reasonable official would have understood their actions to constitute impermissible political patronage, because they did not treat <u>every</u> Pittman supporter adversely.  Defendants cite <u>Taylor v. Bartow County, Ga.</u>, 860 F.Supp. 1526, 1539 (N.D.Ga. 1994), for the proposition that "the political patronage line cannot apply in a situation . . . where an official terminates one employee, and retains another, both of whom worked against her."  Defendants claim, "the political patronage analysis is inapplicable where there is evidence that at least one other deputy clerk campaigned for the clerk's opponent [and was not terminated]."  (Defs MSJ Brief at 43.)

---

[11] <u>Aspinwall v. Herrin</u>, 879 F. Supp. 1227 (S.D. Ga. 1994), a case relied upon by Defendants, discusses the powers of a Georgia sheriff, which are similar in scope to those of a Georgia Clerk.  In <u>Aspinwall</u>, the court acknowledged that the presence of a civil service system sharply curtailed the authority of the sheriff.  Although <u>Aspinwall</u> held that the rights of civil service employees against arbitrary dismissal were not clearly established in early 1993, Defendants cannot in good faith argue that the rights of civil service employees against arbitrary action, such as patronage action, were not clearly established in 2002.  <u>Aspinwall</u> itself, as well as <u>Wayne County v. Herrin</u>, 437 S.E.2d 793 (Ga. App. 1993), give fair notice that the powers of Georgia elected officials operating in counties that have adopted civil service systems are substantially more limited than the powers attributed to sheriffs in <u>Terry</u> and <u>Stough</u>.

Defendants misconstrue Taylor.  The court in Taylor "held that [political patronage analysis] does not apply to the facts of this case, because other employees supported Defendant's opponents and were not terminated."  Id. at 1540 n. 13.  In Taylor, the plaintiff claimed to be the only employee to have suffered the violation of constitutional rights.  The court, refusing to evaluate the claims under the political patronage standard, noted, "political patronage analysis applies to situations involving an en masse discharge, while the Pickering/Connick balancing test applies only when a single employee is affected."  Id. at 1539.  The court concluded that because only a single employee was affected in that case, the Pickering/Connick test was appropriate.  Id.

Taylor does not stand for the proposition that public officials only commit political patronage actions when they violate the rights of every person suspected of supporting an opponent.  At most, Taylor draws a distinction between action taken against one employee, and action taken against more than one, with the latter being the proper subject of the political patronage analysis.  Taylor must further be read in light of Terry, which it cites.  In Terry, the Eleventh Circuit held that the Connick analysis is "not relevant when employees are discharged en masse . . ."

Terry, 866 F.2d at 376.  Terry does not hold the opposite–that political patronage

analysis is not relevant when employees are adversely treated as individuals.

It is undisputed that Defendants engaged in en masse behavior.  Pittman

supporters Michael Armstrong and Lasandra Styles were terminated, and Pittman

supporters Nathanson and Evan Styles were transferred.  Nathanson particularly

was transferred to Brown's supervision.  A reasonable public official would have

fair notice that Defendants' actions constituted impermissible political patronage.

The First Amendment rights protected by Elrod and its progeny are well-

established. The contours of the existing law provided Defendants with fair notice

that they were violating Plaintiff's constitutional rights.  Defendants are not

entitled to qualified immunity.

Regarding Plaintiff's race discrimination claim, it is "patently obvious" that

intentional race-based discrimination in public employment is prohibited.  Smith v.

Lomax, 45 F.3d 402, 407 (11th Cir. 1995).  Defendants argue that they are entitled

to qualified immunity because the law did not clearly establish that discriminating

against "a black male [for] supporting a white male" violated constitutional rights.

The question is not whether Defendants had fair notice that their unique

discriminatory conduct specifically violated the Fourteenth Amendment.  The

relevant question is whether a reasonable official could have believed that it was lawful to rely on race as a factor in deciding to treat a black employee more harshly than a white employee–the constitutionally significant conduct about which Plaintiff has raised a genuine issue of fact.  As Plaintiff notes, "[n]ot only was the law clearly established at that time, by then the law was clearly established that the law was clearly established."  (Pl. Resp. at 33.) citing Alexander v. Fulton County, Ga., 207 F.3d 1303, 1321 (11th Cir. 2000).

IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment [69] is **GRANTED IN PART** and **DENIED IN PART.**  Defendants' Motion is **GRANTED** with respect to Fulton County.  Fulton County is dismissed from this case as a Defendant.  Defendants' Motion is otherwise **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Exceed Page Limitation [68] and Plaintiff's Motion to Permit Him to Extend the Page Limit for His response to Defendants' Motion for Summary Judgment [75] are **GRANTED**.

**SO ORDERED** this 18th day of January, 2007.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE